IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DENNIS GILLAM, *et al.*                                                    PLAINTIFFS

v.                                    4:08-CV-00363-BSM

HARDING UNIVERSITY, *et al.*                                               DEFENDANTS

## ORDER

Defendants' motion for summary judgment [Doc. No. 13] is granted; plaintiffs' motion for summary judgment [Doc. No. 27] is denied; the City's motion to adopt separate defendants' response in opposition to plaintiffs's motion for summary judgment [Doc. No. 34] is granted.  The case is hereby dismissed with prejudice.

## I. INTRODUCTION

Bonds were issued by the City of Searcy, Arkansas ("City"), along with the City of Searcy, Arkansas (Harding University and Harding Place) Public Educational and Residential Housing Facilities Board (hereinafter the "Board"), to fund building projects at Harding University, which is private co-educational liberal arts university, associated with the Churches of Christ.  Plaintiffs allege that issuing the bonds violates (1) the Establishment Clause of the First Amendment to the United States Constitution, (2)  Article 12, § 5 of the Arkansas Constitution, and (3) Amendment 65 of the Arkansas Constitution.

## II. BACKGROUND

Plaintiffs live in White County, Arkansas, and  Harding is located in the City, which is in White County.  Admission to Harding is open to the public.  In 1988, at the request of

Harding, the City created the Board, a public facilities board pursuant to the Public Facilities Board Act (PFBA), Ark. Code Ann. §§ 14-137-101 *et seq*. Under the PFBA, the Board can issue bonds to finance projects that have a public purpose.

The process used by the Board and Harding to issue bonds is as follows. Harding notifies the Board of its interest in financing or refinancing its facilities and then determines the professionals associated with issuing the bonds. The underwriter examines Harding's credit to determine whether Harding has adequate revenue to repay the bonds. The Board determines whether the proposed project qualifies as a facility for postsecondary education, and determines whether the project is consistent with the Board's purposes and objectives of providing adequate facilities for postsecondary education.

For each bond issue, the Board requires that Harding agree: (1) that the facilities being financed by the bond issue will not be used for sectarian instruction, a place of worship, or in connection with any part of the program of a school or department of divinity of any religious denomination; (2) to repay the bonds when due and to pay all expenses in connection with the bonds; (3) to operate and maintain the facilities to be financed as a four-year degree granting institution of postsecondary education; and (4) to maintain its status as a nonprofit corporation under Section 501(c)(3) of the Internal Revenue Code. Doc. No. 15 (Defendants' Statement of Undisputed Facts), ¶ 27. Harding is a nonprofit corporation under Section 501(c)(3). *Id*. at ¶ 42.

If the Board decides that bond financing is appropriate, bond documents are prepared.

An offering document, which explains the purpose and security for the bonds, is given to potential investors. The offering document includes Harding's audit but does not include financial information about the City or the Board. *Id.* The bonds are offered for sale to investors by the underwriter chosen by Harding. When the bonds are sold, a closing occurs in which Harding receives the proceeds of the bonds, and Harding agrees to pay all amounts due with respect to the bonds. *Id.*

All payments by Harding are remitted to the trustee for deposit into a bond fund, and the trustee uses money in the fund to pay the principal and interest on the bonds. All rights of the Board to receive money from Harding are assigned to the trustee for the owners of the bonds. Therefore, the Board does not collect any payments by Harding, or any funds, in connection with the bonds.

The bonds are secured by a pledge of student tuition and dormitory rentals received by Harding. The bonds are not secured by any lien or mortgage on any portion of Harding's campus or on any of the facilities financed with bond proceeds. Doc. No. 15, ¶ 28. The bonds are not secured by any assets or revenues of the City, the Board, or any other public body. *Id.* at ¶ 29. The bonds are not obligations, or general or special debt, of the City, the State of Arkansas ("State"), or any of their political subdivisions. Neither the faith and credit nor taxing power of the City or State or any of its political subdivisions is pledged to the payment of the bonds or the interest on the bonds. *Id* at ¶ 30. Further, the bonds are not general obligations of the Board. *Id.* at ¶ 31.

The Board issued multiple series of bonds under the process outlined above. *Id*. at ¶¶ 7 - 22. The City issued an ordinance approving each series of revenue bonds at issue. Doc. No. 20 (Plaintiffs' Statement of Disputed Facts),¶ 6. The interest on the bonds is exempt from federal income tax, as well as state, county, and municipal taxes in the State of Arkansas. *Id*. at ¶ 38.

### III. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P.

56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## IV.  DISCUSSION

A.   First Amendment

Defendants have not violated the First Amendment to the United States Constitution as charged by plaintiffs in count one of their complaint.  The Establishment Clause of the First Amendment reads: "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  Although the history of the Establishment Clause is long and winding, recent Supreme Court decisions provide that, in determining whether a program violates the Establishment Clause, the court must determine whether the "government acted with the purpose of advancing or inhibiting religion" and if "the aid has the 'effect' of advancing or inhibiting religion." *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997).

> 1. The City and Board did not act with the purpose
> of advancing or inhibiting religion

Plaintiffs concede that the Harding bonds, on their face, express a secular purpose. In that the bonds expressly state that they are being issued for a secular purpose, and not a religious purpose, the court must now determine whether the bonds have the effect of advancing or inhibiting religion.

2.  The aid to Harding does not have the effect
of advancing or inhibiting religion

Courts apply a three part test to determine whether government aid has the effect of advancing religion.  *Agostini*, 521 U.S. at 234-35; *Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406,424 (8th Cir. 2007).  First, does the aid result in governmental indoctrination.  *Id.*  Second, does the aid define its recipients by reference to religion.  *Id.*  And, third, does the aid foster an excessive government entanglement with religion.  *Id.*

a.   Governmental Indoctrination

Plaintiffs have failed to show that the bonds issued by the Board for Harding result in government indoctrination.  There is no assumption of governmental indoctrination; the burden is on the plaintiff to show that the aid in question resulted in indoctrination. 521 U.S. at 223-27.  "The question of whether governmental aid to religious schools results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action." *Mitchell v. Helms*, 530 U.S. 793, 809 (2000) (plurality opinion).

Relying on *Americans United,* plaintiffs contend that the bonds have the primary effect of fostering or promoting religion.  Plaintiffs point to Harding's catalog and student handbook which contain language emphasizing that Harding is a private Christian institution, deeply connected with the Churches of Christ. *See* Doc Nos. 18-10, 18-11.  It seeks to instill in its students a commitment to Christ and  adherence to Christian principles.   Harding's

administration and faculty carry out Harding principles of building Christian character and responsibility in each student. Attendance by students in Bible classes and chapel is compulsory. According to Harding's strategic plan for 2008-2013,

> the Christian worldview is at the core of every academic discipline and every extracurricular activity on campus. Every professor who stands in front of a class, every coach who stands in front of a team, and every director who stands in front of a cast or a music group is to speak and lead as a man or woman of God. They are to confess, both in words and actions, that God created the world, that He redeems us through the blood of His Son Jesus, that He fills his children with His Holy Spirit, and that he calls us to be holy as He is holy. Such core themes will continue to be emphasized in chapel services, in faculty meetings and throughout the university.

[Doc. No. 18-12]

*Americans United* is distinguished from this case because that case involved InnerChange, a residential inmate program within an Iowa prison. Like Harding, InnerChange is a Christian organization and the program is based on Christian values and contains Christian content. 509 F.3d at 424. In that case, however, the Iowa Department of Correction provided *direct* aid to the religious prison program and the prisoners had no other programs from which to choose. Inmates participating in InnerChange received certain benefits or incentives not available to non-participating inmates, such as greater access to computers, more family visits, and greater privacy in their living quarters.

In the present case, the government entity acts merely as a conduit for the issuance of tax exempt bonds. Plaintiffs have presented no evidence that government funds are being used directly for religious purposes. *See Mitchell,* 530 U.S. at 840 (O'Connor, J., concurring

in the judgment). It is clear that Harding cannot and does not use the bond proceeds to finance or refinance facilities for sectarian instruction, "or as a place of religious worship, or . . in connection with any part of the program of a school or department of divinity of any religious denomination." Doc. No. 13-39. Further, neither the City nor the Board is liable for the principal, interest, or costs of issuing the bonds.

Further, in bond issues such as this, no incentive is given to persuade someone to purchase bonds of a religious institution as opposed to a nonreligious institution. In both instances, the investor receives the benefits of the tax-exempt bonds. Any incidental benefit to Harding is in the form of a lower interest rate. *See Hunt v. McNair*, 413 U.S. 734 (1973) (finding that Act authorizing revenue bonds for construction projects at Baptist-controlled college did not violate the Establishment Clause). Thus, as no government funds flow directly to Harding, and no government funds are utilized for indoctrination of religious belief.

    b.    Neutrality

The bonds at issue are religion neutral. The PFBA is also neutral as it makes no distinctions based on religion. Tax-exempt bond financing under the PFBA is open to any entity financing a public facilities project, regardless of religious or nonreligious affiliation. Finally, the City's implementation of the PFBA is neutral.

"[I]n administering aid, a government may not define recipients by reference to religion. The aid must be allocated on the basis of neutral, secular criteria that neither favor

nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Americans United*, 509 F.3d at 425 (internal quotation marks and citations omitted). Plaintiffs argue that the City and the Board are not neutral because the government aid is made available only to Harding. Therefore, financing is not available to both religious and secular beneficiaries. Plaintiffs, however, are incorrect. The Board and City issued the Harding bonds pursuant to their authority under the PFBA. The type of tax exempt bond financing Harding receives under the PFBA is generally available to educational institutions in Arkansas, and has been provided to numerous educational institutions with different religious affiliations, including Lyon College, Hendrix College, John Brown University, and Ouachita Baptist University, as well as those without any religious affiliation, such as Pulaski Academy and The Anthony School. Doc Nos. 33-4 and 33-7.

The ordinance creating the Board states that there was a shortage of postsecondary educational facilities in the City, that financing under the PFBA was necessary for Harding to be able to provide those facilities, and that it is in the best interests of the City to create a public facilities board and to limit the authority of the board to the "accomplishing and financing of facilities" to be operated by Harding. Doc. No. 13-4. In 1995, the Board's powers were expanded to issue revenue bonds in connection with assuring adequate residential housing facilities for the aged. Doc. No. 18-9.

Plaintiffs maintain that because the Board's power is limited to financing Harding

projects, the aid provided by the Board is not available to both religious and secular beneficiaries on a nondiscriminatory basis. There, however, is no evidence that the City favors one religion over the other or that the City ever declined to make aid available to secular (or other religious) recipients. That the City has established only the one board does not mean that its behavior is unconstitutional. The Board was formed after the City determined that its interests would be served by improving the educational facilities at Harding. Thus, the Board was created for the benefit of the City.

Nothing in the record indicates that the Board was formed for the purpose of excluding others. Additionally, while the City has authority to create more than one public facilities board, Ark. Code Ann. § 14-137-106(a)(1) (2009), it has never denied a request for the formation of a public facilities board. Doc. No. 33-6. Moreover, the Harding bonds were issued in a neutral manner via a neutral funding mechanism and the tax benefits are neutrally available. *Mueller v. Allen*, 463 U.S. 388, 397 (1983) (upholding tax deduction to parents for expenses incurred in sending their children to parochial schools).

Finally, the tax exempt bonds at issue are similar to the property tax exemptions in the case of *Walz v. Tax Commission,* 397 U.S. 664, (1970). In *Walz*, the Supreme Court found property tax exemptions to religious institutions did not violate the Establishment Clause. The Court held that the legislative purpose behind the exemption neither advanced nor promoted religion. *Id.* at 672. The court further held that:

> [t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from

>
> demanding that the church support the state. No one has ever suggested exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.' There is no genuine nexus between tax exemption and establishment of religion.

*Id.* at 675.

    c.    Excessive Entanglement

The bonds issued by the Board do not create an excessive entanglement in religion because they are financing buildings utilized for non-sectarian purposes. The issue to be determined is not whether Harding is a religious institution, but whether the aid furthers a religious purpose. Here, the bonds were issued to fund buildings used for higher education and not to promote religion. Therefore, the bonds do not violate the Establishment Clause

Plaintiffs argue that Harding is pervasively sectarian, and therefore any aid to it violates the Establishment Clause. This has been referred to as the pervasively sectarian test and the Supreme Court in *Hunt v. McNair*, 413 U.S. 734 (1973), held that "[a]id normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission . or when it funds a specifically religious activity in an otherwise substantially secular setting." *Id.* at 743.

The City and Harding counter that the pervasively sectarian test is no longer the law. In *Mitchell v. Helms*, 530 U.S. 793 (2000), the Supreme Court rejected an Establishment Clause challenge to direct government aid in the form of library resources, textbooks and instructional materials loaned directly to parochial schools. The Court held that the federal

11

aid program was constitutional under the Establishment Clause because it had a secular purpose and because the aid did not have the primary effect of advancing or inhibiting religion. *Id*. at 807-08. Although a six justice majority of the Court ruled in favor of the ultimate holding, a four justice plurality specifically dispensed with the pervasively sectarian factor, holding that: (1) the Court has not struck down an aid program in reliance on the factor since 1985; (2) "the religious nature of a recipient should not matter to the constitutional analysis, so long as the recipient adequately furthers the government's secular purpose"; (3) focusing on a recipient's religious views, as is required by the pervasively sectarian test, is offensive as courts should not be "trolling through a person's or institution's religious beliefs"; and (4) "hostility to aid to pervasively sectarian schools has a shameful pedigree that we do not hesitate to disavow." *Id*. at 826-28. "In short, nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it. This doctrine, born of bigotry, should be buried now." *Id*. at 829. For the plurality, then, the relevant inquiry was how the aid is assigned, not where the aid goes. *Columbia Union Coll. v. Oliver*, 254 F.3d 496, 502 (4th Cir. 2001).

The viability of the "pervasively sectarian test" is questionable, and its use has been limited. In *Americans United*, the Eight Circuit noted that the "pervasively sectarian" analysis was not part of the clear *Agostini* framework to determine whether the government aid had the effect of advancing religion. 509 F.3d at 424 n. 4. Even in *Steele v. Indust.*

*Dev. Bd. of Metro. Gov't Nashville*, 301 F.3d 401, 409 (6th Cir. 2002), the case upon which plaintiffs rely, the court questioned the viability of the pervasive sectarian test.

In *Steele*, the Sixth Circuit Court of Appeals held that the Establishment Clause was not violated when a government entity issued revenue bonds to finance a loan to David Lipscomb University, another college affiliated with the Churches of Christ. In *Steele*, the plaintiffs sought to enjoin the issuance of tax-exempt bonds for the benefit of David Lipscomb University. The court failed to enjoin the bond issue although it held that the pervasively sectarian test was still the law and it held that David Lipscomb, the recipient of the funds, was a pervasively sectarian institution.

The facts in *Steele* are similar to those here. Lipscomb sought a $15 million, low-interest loan from the Nashville Industrial Development Board ("IDB"). The IDB approved the loan and financed it by issuing tax-exempt industrial development bonds. *Id*. at 402. There were no local revenues spent in connection with the bonds, and neither the IDB nor the Metropolitan Government could be held liable for the principal or interest on the bonds, or any costs associated with the bond issuance. *Id.* at 403.

The plaintiffs in *Steele* alleged that the issuance of tax exempt revenue bonds violated the Establishment Clause, as they were for the benefit of a pervasively sectarian institution. The Sixth Circuit held that "[r]egardless of whether the pervasively sectarian test is still the law, we conclude that, given the nature of the aid in question, the issue of the bonds does not offend the Establishment Clause." *Id* at 409   The court further held:

> Because the proposed issuance of industrial revenue bonds to Lipscomb University is part of a neutral program to benefit education, including that provided by sectarian institutions, and confers at best only an indirect benefit to the school, we hold that the issuance of the bonds does not violate the First Amendment.
>
> In sum, the nature of the institution is not the relevant inquiry in the special type of aid at issue in this appeal. The nature of the aid conferred by the tax free revenue bonds is not direct aid. Instead, it is analogous to an indirect financial benefit conferred by a religiously neutral tax or charitable deduction and is indistinguishable from that expressly approved in *Walz,* [397 U.S. 664 (1970)]. . . . The funding vehicle is available on a neutral basis. No government funds will be expended. Nor does any holder of a bond have recourse against the Board or Metro in the even of non-payment. The benefit to be obtained by Lipscomb University is the same provided to private companies which create identical economic opportunities. The conduit financing advances a clear governmental, secular interest in promoting economic opportunity. Finally, the revenue bond program does not present the perception of government endorsement of religion.

*Id* at 416-17.

Similarly, in *Virginia Coll. Bldg. Auth. v. Lynn*, 260 Va. 608, 538 S.E.2d 682 (2000), the Virginia Supreme Court found that tax exempt bonds issued by the Virginia College Building Authority (VCBA) for the benefit of Regent University, a "pervasively sectarian" college founded by Christian televangelist Pat Robertson, did not violate the Establishment Clause. The court focused on the unique nature of the bond program. *Id*. at 698.

> The issuance of VCBA bonds on behalf of Regent does not result in governmental indoctrination because it determines eligibility for aid neutrally. Any funds that Regent receives are from the private choices of investors. The aid has no impermissible content. No government funds ever reach Regent's coffers. No government funds are used or pledged for any purpose and "this carefully constrained program also cannot reasonably be viewed as an endorsement of religion." We hold that, with the exception of the School of Divinity, allowing Regent's participation in the VCBA bond financing

program does not offend the Establishment Clause

*Id.* at 639 (quoting *Agostini,* 521 U.S. at 235).

Finally, the Supreme Court has consistently held that the government may directly aid religiously affiliated colleges and universities. *e.g. Tilton v. Richardson*, 403 U.S. 672 (1971) (upholding direct federal grants to colleges and universities, including private religious schools, for the construction of buildings and facilities used for secular purposes); *Roemer v. Bd. of Pub. Works of Maryland*, 426 U.S. 736 (1976) (upholding Maryland statute authorizing payment of funds for secular to eligible colleges and universities, including four Catholic colleges). *See Agostini*, 521 U.S. at 225 ("we have departed from the rule . . . that all government aid that directly assists the educational function of religious schools is invalid."). As the court in *Columbia Union* noted, "the Court has never struck down a government aid program to a religiously affiliated college or university." 254 F.3d at 507.

For the reasons set forth above, whether Harding is pervasively sectarian is of little relevance, if any, to the inquiry in this case. The issue is whether the funds from the bond issue were used to advance or inhibit the exercise of religion. The facts of this case are clear that the bonds at issue neither promote nor inhibit religion.

**B. Article 12 § 5 of the Arkansas Constitution**

The bonds at issue here do not violate the Arkansas Constitution. Section 5 of Article 12 of the Arkansas Constitution reads "[n]o county, city, town or other municipal corporation, shall become a stockholder in any company, association, or corporation; or

obtain or appropriate money for, or loan its credit to, any corporation, association, institution or individual." Ark. Const. Art. 12, § 5 (2008).

Plaintiffs maintain that the bonds violate Article 12, § 5, because the City and Board issued the bonds to "obtain" money for Harding, a "private corporation." An examination of the bond process, described above, establishes that this is not the case. The Board was merely a conduit through which the bonds were issued.

Here, public resources were not expended in the issuance of the bonds. Harding pays all expenses in connection with the bonds. The bonds are not secured by any assets or revenues of the City, the Board, or other public body. "The bonds are to be paid by revenue (student fees and tuition) generated by the college." *Cortez v. Independence* County, 287 Ark. 279, 282, 698 S.W.2d 291, 292 (1985) (educational facilities bonds issued by Arkansas Public Health and Education Facilities Board for construction and physical improvements at private Arkansas college did not violate Art. 12, § 5). *See Wayland v. Snapp*, 232 Ark. 57, 62-63, 334 S.W.2d 633, 636-37 (1960) (revenue bonds issued by City of Batesville not general obligation of the City, and do not violate Art. 12, § 5).

**C. Amendment 65 to the Arkansas Constitution**

The bonds do not violate Amendment 65 as alleged by plaintiffs and Amendment 65 does not prohibit financing of private universities or private educational facilities. The PFBA specifically states that educational facilities qualify as public facilities projects and Amendment 65 provides that private user facilities such Harding's project may receive

public funding. Moreover, the Arkansas Supreme Court has held that education, in general, is a legitimate public purpose.

Plaintiffs allege that the bonds violate Amendment 65 to the Arkansas Constitution because they do not serve a public purpose. Amendment 65, which was enacted in 1986, deals with revenue bonds. Section 1 reads, in part:

> any governmental unit, pursuant to laws heretofore or hereafter adopted by the General Assembly, may issue revenue bonds for the purpose of financing all or a portion of the costs of capital improvements of a public nature, facilities for the securing and developing of industry or agriculture, and for such other public purposes as may be authorized by the General Assembly.

Ark. Const. Amend. 65, § 1.

Under the PFBA, public facilities boards may use available "funds and revenues for the accomplishment of all or a portion of public facilities projects and may issue bonds . . . for the accomplishment of all or a portion of public facilities projects." Ark. Code Ann. § 14-135-115(a). Educational facilities, including facilities for postsecondary education, are public facilities projects. Ark. Code Ann. §§ 14-135-106(a)(1), b, and c, and 14-137-113. Educational facilities are defined as "real, personal, and mixed property of any kind intended for use by an education institution in furtherance of its educational program including, but not limited to, dormitories, classrooms, laboratories, athletic fields, administrative buildings, utilities, equipment and other property for use therein or thereon." Ark. Code Ann. § 14-137-103(22). The PFBA does not distinguish between private and public educational facilities.

Limitations as to what type of facilities may be financed through revenue bonds are set out in Amendment 65, which provides:

> (a) No revenue bonds shall be issued by or on behalf of any government unit if the primary purpose of the bonds is to loan the proceeds of the bonds, or to lease or sell the facilities financed with the proceeds of the bonds, to one or more private business users for shopping centers or other establishments engaged in the sale of food or goods at retail.
>
> (b) No revenue bonds shall be issued by or on behalf of any governmental unit without the consent of a majority of the qualified electors voting on the question at an election held in accordance with state law if the primary purpose of the bonds is to loan the proceeds of the bonds, or to lease or sell the facilities financed with the proceeds of the bonds, to one or more private business users for hotels or motels, rental or professional office buildings, or facilities for recreation or entertainment.

Amendment 65 is consistent with the holding in *Cortez v. Independence County*, 287 Ark. 279, 698 S.W.2d 291 (1985), which was decided before Amendment 65 came into effect. The plaintiff in *Cortez* challenged the constitutionality of educational facilities bonds used to finance construction and physical improvements at Arkansas College, a private, Presbyterian-affiliated university, which was later renamed Lyon College. The plaintiff argued that the bonds did not have a valid public purpose.

> Public policy is declared by the General Assembly; not by courts. Unless there is something in the Constitution restraining the Legislature from saying that a designated course of conduct or a policy is for the pubic welfare, or unless the thing authorized is so demonstrably wrong that reasonable people would not believe that such was the legislative intent, the Act must prevail.

*Kerr v. East Central Ark. Regional Housing Authority*, 208 Ark. 625, 630, 187 S.W.2d 189, 192 (1945).

In *Cortez*, the court noted that in enacting the PFBA, the Arkansas General Assembly determined "that adequate 'educational facilities' are essential to the public welfare and that public financing is an essential alternative means of financing them." 287 Ark at 282, 698 S.W.2d at 292. The court found that there was no indication that the legislature intended to exclude private colleges. 287 Ark. at 283, 698 S.W.2d at 293. The court concluded: "We made it clear in *Turner v. Woodruff,* [286 Ark. 66, 689 S.W.2d 527 (1985)] that education, in general, is a legitimate public purpose." *Id.*

## V. CONCLUSION

Accordingly, defendants' motion for summary judgment [Doc. No. 13] is granted; plaintiffs' motion for summary judgment [Doc. No. 27] is denied; the City's motion to adopt separate defendants' response in opposition to plaintiffs's motion for summary judgment [Doc. No. 34] is granted. The case is hereby dismissed with prejudice.

IT IS SO ORDERED this 24th day of June, 2009.

_____
UNITED STATES DISTRICT JUDGE